**TEXACO, INC., Appellant,**

v.

**Jimmy N. PRUITT, Appellee.**

No. 9595.

United States Court of Appeals
Tenth Circuit.

June 6, 1968.

Stephen B. Nebeker, Salt Lake City, Utah (C. Preston Allen, Salt Lake City, Utah, on the brief), for appellant.

Arthur H. Nielsen, Salt Lake City, Utah (Duane A. Frandsen, Price, Utah, and Charles Welch, Jr., Salt Lake City, Utah, on the brief), for appellee.

Before MURRAH, Chief Judge, MARVIN JONES,[*] Judge Court of Claims, and BREITENSTEIN, Circuit Judge.

MURRAH, Chief Judge.

While Sayer's Well Servicing Company, Inc. was servicing a pump on a Utah oil well owned by defendant-appellant Texaco, Inc., plaintiff-appellee Pruitt, an employee of Sayer's, was seriously injured when a piece of the pumping equipment known as a "horsehead" fell upon him. Having collected workmen's compensation as an employee of Sayer's, Pruitt brought this action against Texaco, alleging that Texaco negligently permitted the horsehead to fall.[1] Texaco denied any negligence, asserting that Sayer's negligence caused the accident, and in any event, that Pruitt was contributorily negligent. Texaco appeals from a substantial judgment on a jury verdict. We affirm.

The pumping unit involved in the accident consists of three main pieces— a horsehead, a walking beam and a tripod. The "horsehead" is a large metal object shaped roughly like the head of its namesake. It is attached to one end of the "walking beam"—a long horizontal metal beam similar to a girder. The center of the walking beam rests upon and is affixed to the tripod, which acts as its fulcrum. A pump jack is attached to the other end of the walking beam and, when actuated, creates a seesaw motion of the beam.

Two steel cables called "bridles" hang down from the top of the horsehead. They are attached to a "polished rod" which extends through a "stuffing box" and is attached to rods which operate the pump at the bottom of the well. Propelled by the seesaw movement of the walking beam, the rods move up and down inside tubing, through which the oil is pumped to the surface.

The evidence shows that the horsehead is about 13 feet long and weighs approximately 2000 pounds. It has a groove on its back side which fits over a two-inch "lip" on the top of the walking beam. Near the bottom of the beam both the horsehead and beam have a two-inch slot through which a bolt is inserted. An employee of the manufacturer of the pumping unit testified that this particular unit calls for a ¾ inch bolt. He also explained that the purpose of the bolt is twofold: (1) to keep the horsehead on the beam in case a rod breaks in the well, and (2) to hold the horsehead in place after it is centered with two adjusting screws.

Texaco maintained a production foreman and several employees in the field who made daily visits to the wells, and had the responsibility of maintaining and servicing the surface pumping units. Texaco had a contract with Sayer's and another well servicing company to service the pump at the bottom of each well.

Two or three days prior to the date of the accident, the surface pumping unit on the well in question was operating but no oil was being produced. The other servicing company (Falco) was called in to "trip the sub-surface pump",[2] but when its efforts proved unsuccessful, Sayer's was asked to "bump bottom and space the pump". To perform this operation, Sayer's shut down the pump and

---

[*] Sitting by designation.

1. The basis of this suit is § 35–1–62 of the Utah Workmen's Compensation Act, which provides that when an injury to an employee is caused by the wrongful act or neglect of another person not in the same employment, the injured employee may claim workmen's compensation and may also have an action for damages against the third person.

2. This operation involves pulling the string of rods from the well and hanging them on the derrick, pulling the pump from the bottom of the well to the surface, checking the pump and then returning it to the bottom, and replacing all of the rods.

raised a 65 foot portable derrick directly over the well. Cables were then run from a diesel engine beside the derrick up through the top of the derrick and down to the polished rod. Three objects referred to as a block, hook and elevator were affixed to the end of the cable, and apparently were used to attach the cable to the polished rod. After the bridles were disengaged, the rods were lowered several feet further into the well so as to put pressure on the pump at the bottom. The purpose of the operation is to "seat" the pump more firmly at the bottom of the well and dislodge any foreign material that might be interfering with the pump's operation. The operator of the diesel engine was in the process of lifting the rods when the horsehead fell from the walking beam onto Pruitt, who was working at the stuffing box immediately under the horsehead.

The trial judge submitted the question of Texaco's negligence to the jury, but instructed as a matter of law that Pruitt was not contributorily negligent. The jury's verdict in favor of Pruitt was necessarily based upon a finding that Texaco's negligence caused the injury.

Texaco's initial contention is that the trial judge should have directed a verdict in its favor for want of any evidence of actionable negligence on its part. But the sufficiency of the evidence must be adjudged in the light of the rule of law by which Texaco's legal liability is to be determined. We are brought, therefore, to a consideration of the nature of the legal duty owed by Texaco to Sayer's employees and the situations under which this duty becomes operative.

■ It is the general rule, applicable in Utah, that an owner of premises or the general contractor of work being performed thereon, who has neither reserved nor exercised direction or control over the particular work being performed by a contractor or subcontractor, as the case may be, owes no legal duty to provide an employee of the contractor or subcontractor "a safe place to work * * * or to guard him against dangers incident to or created by the prosecution of the work, and certainly not to guard or protect him against the negligence of those who had employed him or with whom he labored." Dayton v. Free, 46 Utah 277, 148 P. 408, 412. See also Titan Steel Corp. v. Walton, 365 F.2d 542. Such an owner or general contractor is, however, under a legal duty to warn or guard against concealed or latent conditions of danger on the premises of which he has or ought to have knowledge and of which the employee has none. See Gulf Oil Corp. v. Bivins, 276 F.2d 753; Titan Steel Corp. v. Walton, supra. And see also United States Steel v. Warner, 378 F.2d 995; Demarest v. T. C. Bateson Const. Co., 370 F.2d 281.

■ Although the pretrial order defining the triable issues left in dispute Texaco's ownership and control of the pumping equipment, the case was apparently tried and submitted to the jury on the assumption that Texaco, as the owner and operator of the well, contracted to Sayer's the performance of the work which was being done at the time of the accident. There is no evidence to indicate that any Texaco employee was present or had anything to do with Sayer's servicing operation. In any event, there is nothing in the record to indicate that the issue of control was submitted to the jury. We think it is clear that Texaco exercised no direction or control over the particular work being performed, and therefore, had only the duty of warning or guarding Sayer's employees against concealed or latent conditions of danger on the premises. The issue then must be whether Texaco allowed the horsehead to be insecurely fastened to the walking beam so as to create a latent condition of danger, or whether, as Texaco contends, the horsehead was pulled off the beam by Sayer's servicing rig.

The evidence was conflicting, and mostly speculative, as to the cause of the accident. An employee of Falco testified that the horsehead was taken off when his company serviced the well two or three days prior to the accident, and he noticed that the bolt removed was

a ⅝ inch rather than the prescribed ¾ inch bolt. He further testified that even though the bolt was "smaller than * * * normal", he directed another employee to put it back in the horsehead because "we don't change any bolts". Two witnesses for Texaco testified that a bolt removed from the walking beam the day after the accident was a ¾ inch bolt. A Sayer's employee testified that he recalled "seeing that the elevator caught the horsehead and raised it up." He admitted, however, that he was not "hundred per cent sure". Other witnesses testified that the elevator was above the horsehead during the "bumping" operation. The operator of the diesel engine testified that the engine's weight indicator gauge showed no sudden increase in weight while the rods were being lifted. He explained that if something on his cable had caught the horsehead, a "very fast" weight increase would have registered on the gauge.

We have repeatedly held "that a verdict may not be directed unless the evidence points all one way and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion is made." United States Steel v. Warner, supra, at p. 998. See also Christopherson v. Humphrey, 366 F.2d 323. It is too clear for argument that the evidence here is not all one way in favor of Texaco. The case was for the jury under the applicable rule of legal duty and liability.

Texaco next complains that the trial judge prescribed an erroneous legal duty of care when he instructed the jury that Texaco had the "continuous duty * * to use reasonable care and prudence to furnish the employees of Sayer's * * with a reasonably safe place within which to perform their work." Texaco saved its record by specifically objecting to the use of the phrase "safe place to work" to describe Texaco's duty to Pruitt. The objection and the argument here is that although Texaco owed invitee Pruitt the duty to "use reasonable care", the duty to provide a safe place to work was owed by Pruitt's employer, Sayer's, not Texaco.

The phrase "safe place to work" has been loosely used to characterize both the duties of an employer incident to the prosecution of the work being done, and the altogether different duty of an owner or contractor not in control of the work being done to warn or guard against concealed or latent dangers on the premises. As we have seen, these duties are separate and distinct, and confusion results when they are articulated by the same or similar words. It is accurate to say that an employer or person in control of the premises and the work being done must provide a safe place to work, but it is inaccurate and misleading to say that an owner or general contractor not exercising direction over the particular work being performed is under such an obligation.

Although Judge Ritter did use the phrase "safe place within which to perform their work" to describe Texaco's legal obligation to the employees of Sayer's, he did not stop there but went on to explain the meaning of his words: "this duty required [Texaco] to use reasonable care to inspect the equipment, and particularly the horse's head and walking beam and other units of the pumping equipment, to repair the same when necessary, and to keep the horse's head securely fastened to the walking beam." We think his explanation sufficiently advised the jury that Texaco's legal duty was to guard against hidden dangers inherent in the premises rather than unsafe conditions incident to or created by the work being done, and enabled the jury to arrive at an intelligent verdict.

Complaint is also made of the trial judge's refusal to allow counsel for Texaco to argue to the jury that the "polished rod clamp" caught on the horsehead and pulled it from the walking beam. The polished rod clamp is a "little box contraption" attached to the polished rod. The superintendent in charge of Sayer's servicing operation testified that the clamp had been removed during the "bumping operation".

Another witness, the operator of the diesel engine, testified that the clamp had been "removed in order for me to touch bottom." Pruitt, when asked what caught on the horsehead, if anything, replied: "I was presuming in my mind that the polish rod clamp caught it. * * * But I didn't see it, and I don't know."

■ We agree with the trial judge that the evidence was insufficient to allow Texaco "to take that clamp to the jury." It appears to be undisputed that the clamp was removed from the polished rod. Moreover, Texaco was not prevented from presenting its causal theory of the accident to the jury. It apparently was given wide latitude to argue that some other object, such as the block, hook, elevator or box (a coupling between two sections of rod), caught on the horsehead and pulled it from the walking beam.

Texaco next asserts that the trial judge erred in refusing to submit to the jury the question of contributory negligence on the part of Pruitt. It is argued that Pruitt was negligent in that: (1) he walked out on the walking beam and should have seen whether or not the horsehead was properly attached, and (2) he placed himself under the horsehead when the servicing unit was lifting the rods.

■ We agree with Judge Ritter that there was no evidence of contributory negligence. The walking beam was two to three feet in depth, and the slot for the bolt was located near the bottom of the beam. Certainly a man on top of the beam would be in no position to observe that a bolt underneath was not of the proper size. Nor was Pruitt negligent in placing himself under the horsehead when the rods were being lifted. He was not at a place he should not have been; instead, he was stationed at his post of duty next to the stuffing box. Moreover, it was customary to leave the horsehead on the walking beam while performing this "bumping" type operation. The horsehead was not in motion, but had been stopped on the downstroke and a brake applied. In our opinion there was nothing to indicate that any danger would be involved in working beneath it.

Finally, Texaco contends that the trial judge erroneously refused to reduce the amount of the judgment awarded Pruitt by $18,000—the amount of workmen's compensation benefits paid to Pruitt. The argument is that the trial judge should have held Sayer's negligent as a matter of law, or in any event, submitted that issue to the jury; and that because of its negligence, Sayer's and its insurance carrier, standing in its shoes, are precluded from recovering the amount of compensation benefits paid to Pruitt.

Section 35–1–62 of the Utah Workmen's Compensation Act, which authorizes an injured and compensated employee to bring an action against a third party wrongdoer, also provides that "[i]f any recovery is obtained against such third person * * * [t]he person liable for compensation payments shall be reimbursed in full for all payments made." It does not by its terms preclude a negligent employer or its insurance carrier from recovering the amount paid to the injured employee. There is, however, respectable authority denying reimbursement to such employer or carrier on the principle that "[one should not] profit from its own wrong." Witt v. Jackson, 57 Cal.2d 57, 17 Cal.Rptr. 369, 366 P.2d 641, 650 (1961). See also Liberty Mutual Insurance Co. v. Adams, 91 Idaho 151, 417 P.2d 417 (1966). Although admitting that the majority of jurisdictions have held that a third party tortfeasor cannot assert the concurrent negligence of the employer as a defense, whether the employer, the employer's carrier, or the employee has brought the action against him,[3] Texaco argues

3. Baker v. Traders & General Ins. Co., 199 F.2d 289; Cyr v. F. S. Payne Co., 112 F.Supp. 526; Williams Bros. Lumber Co. v. Meisel, 85 Ga.App. 72, 68 S.E.2d 384; Fidelity & Casualty Co. v. Cedar Valley Electric Co., 187 Iowa 1014, 174

that Witt and and Adams, being California and Idaho decisions, would be highly persuasive on the Utah courts, which have not faced the problem.

Judge Ritter refused to consider or submit the issue of Sayer's negligence to the jury, holding that it had no bearing on the carrier's right to reimbursement. He reasoned that "the legislature legislated in this area with some particularity * * *. They mention that the carrier is entitled to be reimbursed, and that is unqualified. If they had meant to impute the negligence of the employer to the insurance carrier, they very easily could have said so * * *." Where the state supreme court has not ruled upon the precise question before us, we will accept the Federal trial judge's interpretation of his state law unless convinced that he is clearly wrong. See Rooney v. Mason, 394 F.2d 250 (10 CA May 13, 1968); Adams v. Erickson, 394 F.2d 171 (10 CA May 10, 1968); Smith v. Greyhound Lines, Inc., ·10 Cir., 382 F.2d 190. In this case we certainly cannot so say.

Affirmed.

N.W. 709; City of Shreveport v. Southwestern Gas & Electric Co., 145 La. 680, 82 So. 785; General Box Co. v. Missouri Utilities Co., 331 Mo. 845, 55 S.W.2d 442; Utley v. Taylor & Gaskin, 305 Mich. 561,

9 N.W.2d 842; Graham v. City of Lincoln, 106 Neb. 305, 183 N.W. 569; Royal Indemnity Co. v. Southern California Petroleum Corp., 67 N.M. 137, 353 P.2d 358.