Floyd Allen JONES and Norene Jones, Appellants (Plaintiffs),

v.

CHEVRON U.S.A., INC., Appellee (Defendant),

James Bennion; William Jones; Jeff Trampis and Does 1 through 5 (Defendants).

No. 85–166.

Supreme Court of Wyoming.

May 1, 1986.

Rehearing Denied June 6, 1986.

Richard H. Honaker (argued) Rock Springs, and Jack A. Rose, Anaheim, California, for appellants, Robert W. Tiedeken of Terry W. Mackey, P.C., Cheyenne, filed an amicus curiae brief on behalf of the Wyoming Trial Lawyers Association.

Mark W. Gifford of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

This is an appeal from a summary judgment granted Chevron U.S.A., Inc. in a suit brought by appellant Floyd Jones for electrocution injuries he suffered while painting a transformer platform owned by Chevron. There are several interrelated issues which demand our attention. At the outset, we must decide whether an owner of a work site has a duty to protect an employee of an independent contractor from hazards of the work site which are incidental to the very work the contractor is hired to perform. If we find that the owner owes such a duty, we must determine whether it runs to an employee who is harmed by obvious man-made hazards. Finally, we

must decide whether an owner can be vicariously liable to his contractor's employee for the contractor's negligent acts. This last issue involves the application of the special-risk doctrine of §§ 416 and 427 of the Restatement, Second, Torts. We reverse in part and affirm in part.

## FACTS

On September 8, 1978, Chevron U.S.A., Inc. entered into a general service contract with Automation & Electronics, Inc. in which Automation agreed to

"[f]urnish labor, materials and equipment as needed to perform work as instructed by Chevron representatives."

The parties agreed that Automation would "perform the work as an independent contractor and not as an employee of [Chevron]." The contract also provided with respect to safety:

"Contractor agrees, while on [Chevron's] premises or vessels, to observe such safety rules as [Chevron] shall prescribe as necessary for the protection of personnel and property * * *."

In September 1980, pursuant to the 1978 general service contract, Chevron hired Automation to construct power lines running to some of Chevron's oil and gas wells near Evanston. Chevron provided the specifications for all the power line components and employed a surveyor who staked the locations for the power poles. Automation crews erected the power poles, installed insulators and other hardware, and strung the lines. The lines were then energized.

Appellant Floyd Jones had joined Automation as an apprentice electrician in August of 1980 and worked at the Chevron project since its inception in early September. He was a member of foreman William Jones' work crew. On October 10, 1980, appellant was instructed by his foreman to paint the metal portions of an H frame which the crew had completed in early October and which had been energized on October 3rd. The H frame consisted of two wooden power poles which were set about twenty feet apart and connected by a horizontal platform. The platform was a wooden deck supported by metal braces affixed about halfway up the poles. Two transformers rested on the platform and were wired to the main power lines which ran horizontally across the tops of the poles.

After appellant painted the metal under the platform, he climbed onto the platform to complete the job. Electricity arced from the transformers to appellant, coursed through his body and knocked him from the platform. He sustained serious injuries.

Appellant filed a complaint in the district court naming as defendants Automation & Electronics, Inc., Chevron U.S.A., Inc., his supervisors, several unnamed fellow employees, and several unnamed employees of Chevron. Automation was dismissed from the suit because of the bar of the Worker's Compensation Act. Chevron moved for summary judgment.

The affidavits and depositions in support of and in opposition to summary judgment disclose several disputes of fact. First, while it is clear that appellant's foreman and fellow crew members were present when appellant was ordered to paint the H frame, there is a dispute as to whether a Chevron engineer was on the scene. Appellant stated in his affidavit that he received instructions to paint the H frame right after he interrupted a conversation between his foreman and a Chevron engineer named either Bob or R.G. But, Chevron's lead project engineer, R.L. "Bob" Kiyoi, stated in his affidavit:

"To the best of my recollection, I was not at the job site at the time of Floyd Jones' injury."

Appellant's foreman testified in his deposition that he did not remember any Chevron personnel being present.

There is also some dispute over what was said. In his deposition, appellant's foreman testified that he told the crew "to go up the poles and paint as far as they could reach." He also recalled telling them to paint the part they could not reach "out of the bucket truck." But in his affidavit

appellant indicated that the instructions were less specific and led him to believe that he could safely paint the entire platform without the bucket truck. He claims that he asked his foreman, within the hearing of the Chevron engineer, whether the H frame was "ready for [them] to go up." According to appellant, his foreman told him it was ready, and another foreman told him "everything is clear." He assumed from his conversations with his foreman and the silence of the Chevron engineer that the power was off.

There is little dispute in the summary judgment materials about the procedure for de-energizing the power lines. Automation could de-energize lines only after obtaining permission from Chevron. Appellant's supervisor did not request a shutdown before he ordered the painting to proceed because it would have taken about an hour to get permission from Chevron's well operators.

Based on the affidavits, depositions and other summary judgment materials before it, the district court found that Chevron owed appellant no direct duty of reasonable care. The court held:

    a. that, as a matter of law, owners "are not obligated to protect employees of an independent contractor * * * from hazards which are incidental to or a part of the very work the independent contractor was hired to perform";

    b. that an owner's duty to discover and warn his invitees of dangers on the premises does not extend to employees of an independent contractor who suffer physical harm "caused by a special danger encountered * * * while engaged in the performance of inherently dangerous work";

    c. that appellant's employer was an independent contractor;

    d. that, as a matter of fact, the dangers of the transformer tower were obvious to appellant. Therefore, the obvious-danger rule barred his recovery as a matter of law; and

    e. that Chevron could not be vicariously liable for Automation's negligence be-
cause Automation was Chevron's independent contractor not its employee; that the special-risk doctrine of § 416 of the Restatement, Second, Torts, which prevents an owner from delegating its duty of care to an independent contractor under some circumstances, did not apply because, according to the court, the doctrine had not "been adopted or approved by the Wyoming Supreme Court [and] is not the law of Wyoming * * *."

## SUMMARY JUDGMENT

"When reviewing a summary judgment on appeal, our duty is the same as that of the district court in that we have before us the same material and must follow the same standards. The party moving for summary judgment has the burden of proving there exists no genuine issue of material fact and that [he] is entitled to judgment as a matter of law. We look at the record from the viewpoint most favorable to the party opposing the motion, giving him every favorable inference which may be drawn from facts in the affidavits, depositions, and other material properly submitted in the record." (Citations omitted.) *Noonan v. Texaco, Inc.*, Wyo., 713 P.2d 160, 162 (1986).

## DUTY OF OWNER TO INVITEE

    ■ An owner may be liable to a worker who is injured on the owner's premises under either of two theories. First, the owner may be responsible for the negligence of the worker's employer under the doctrine of respondeat superior. Second, "quite apart from any question of vicarious responsibility, the employer may be liable for any negligence of his own in connection with the work to be done. * * So far as he in fact gives directions for the work, furnishes equipment for it, or retains control over any part of it, he is required to exercise reasonable care for the protection of others * * *. If the work is done on the employer's own land, he will be required to exercise reasonable care to prevent activities or conditions which are dangerous to those outside of

it, or to those who enter it as invitees. In all of these cases, he is liable for his personal negligence, rather than that of the contractor." (Footnotes omitted.) W. Keeton, Prosser and Keeton on Torts § 71 at 510–511 (1984). See also *Ruhs v. Pacific Power & Light*, 671 F.2d 1268, 1272 (10th Cir.1982) (applying Wyoming law).

Appellant claims that Chevron is liable under both theories in the case at bar. We will first analyze his claim that Chevron was directly responsible for his injuries.

Appellant argues that he was an invitee and that Chevron, therefore, owed a duty to protect him from the dangerous condition of its premises and the dangerous acts and omissions of its employees. He alleges that Chevron's premises were unsafe because Chevron made it difficult for Automation to shut the power off while work went forward on the power lines and that Chevron was negligent when its engineer at the scene of the accident neither warned appellant that the power was on nor ordered that the line be de-energized.

Chevron counters that the direct duty of an owner to an invitee does not extend to an employee of an independent contractor who is injured by a hazard that is part of the very work the independent contractor was hired to perform.[1] If Chevron is correct, then the district court properly granted summary judgment as a matter of law. The duty running from the defendant to the plaintiff in a negligence case is

"entirely a question of law, to be determined by reference to the body of statutes, rules, principles and precedents which make up the law; and it must be determined only by the court." W. Keeton, Prosser and Keeton on Torts § 37 at 236 (1984). See also *Caterpillar Tractor Company v. Donahue*, Wyo., 674 P.2d 1276, 1280 (1983).

But if there was a duty running from Chevron to appellant, as a matter of law, then summary judgment was proper only if one of the other negligence elements—breach of duty, proximate cause, or damages—was missing from appellant's case.

■ As a general rule,

"[a]n independent contractor's employee who goes on the owner's premises is an invitee to whom the owner may be liable for injury caused by an unsafe condition of the premises." *Ruhs v. Pacific Power & Light*, supra, 671 F.2d at 1272 (applying Wyoming law); *Tauscher v. Puget Sound Power and Light Company*, 96 Wash.2d 274, 635 P.2d 426, 430 (1981); 26 Am.Jur.2d Electricity, Gas, and Steam § 64 at 269.

But there is an exception to this duty. An owner is not obligated to protect the employees of an independent contractor from hazards which are incidental to, or part of, the very work the contractor was hired to perform. *Holdaway v. Gustanson*, 546 F.Supp. 231, 233 (D.Wyo.1982), rev'd on other grounds sub nom., *Holdaway v. Amoco Production Company*, 751 F.2d 1129 (10th Cir.1984); *Wolczak v. National Electric Products Corporation*, 66 N.J.Super. 64, 168 A.2d 412, 417 (1961); 41 Am.Jur.2d Independent Contractors § 27 at 784.[2]

---

**1.** Chevron relies heavily on our recent decision in *Noonan v. Texaco, Inc.*, Wyo., 713 P.2d 160 (1986). According to Chevron, Noonan stands for the proposition that there is no duty running from an owner to the employee of an independent contractor who is injured while doing the job for which his employer, the contractor, was hired. Noonan, in fact, is not so broad. We simply applied the unremarkable rule of law that ordinarily an owner is not liable under the theory of respondeat superior for the negligence of his independent contractors. See Restatement, Second, Torts § 409. The *Noonan* case does not control when direct negligence of the owner, rather than respondeat superior is in-

volved. Nor does it identify the exceptions to the basic rule of vicarious liability.

**2.** The New York courts have formulated an explicit version of this exception which can be applied in many cases, including the case at bar: An owner has no duty to either furnish a safe place to work or to give warning of danger

"(a) where the structure is defective and the workman is employed for the specific purpose of correcting or repairing the defect, * * * [or] (b) * * * where the work is in the construction of the place, as in the case of a lineman who is injured because of a polesetter's negligence in setting a new pole in soft

This exception was developed to protect owners from suits by contractors who presumably assumed the risks associated with the work they undertook on the owner's premises. *Wolczak v. National Electric Products Corporation*, supra, 168 A.2d at 417. But the assumption-of-risk rationale does not apply very well when a contractor's employee, rather than the contractor, is injured. Unless he is willing to lose his job, the employee is often forced to work under whatever contract his employer makes with the owner. He does not voluntarily assume the risks of the job site. See W. Keeton, Prosser and Keeton on Torts, supra, § 68 at 490.

The owner's lack of control over the job site is a better reason for the exception. An owner usually hires an independent contractor because of the contractor's expertise in the type of work involved. In order to do the job, the contractor is generally given control over the hazards incidental to the work. The owner should be permitted to assume that

"the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly." *Wolczak v. National Electric Products Corporation*, supra, 168 A.2d at 417.

▮ Because the exception is based on the owner's delegation of control to the contractor, it should not apply when the owner maintains control over the hazard that causes the harm. For example, suppose a power company hires an electrical

contractor to repair hardware on the company's poles but the contractor is not expected to replace the poles. The power company has a duty "commensurate with the control retained" to provide safe poles for the contractor's employees. *Conover v. Northern States Power Company*, Minn., 313 N.W.2d 397, 407 (1981). If, on the other hand, the contractor is hired to either replace defective poles or install new ones, then the power company has no duty to the contractor's employees to protect them from dangerous poles as long as the contractor controls the installation process. *Paul v. Staten Island Edison Corporation*, 2 A.D.2d 311, 155 N.Y.S.2d 427, 439 (1956).

The link between control and owner liability is codified in § 414 of the Restatement, Second, Torts which states:

"One who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

An owner does not have to retain a great deal of control over the work to be liable for an employee's harm under § 414. In fact, comment (a) to § 414 indicates that the owner can be liable even if he gives up enough control to make the contractor an "independent contractor" under vicarious liability analysis.[3]

---

marshy ground, both of them being fellow servants engaged as part of the same gang in the operation of erecting a series of new poles and wires." *Paul v. Staten Island Edison Corporation*, 2 A.D.2d 311, 155 N.Y.S.2d 427, 439 (1956).

The problem with the New York exception is that it only seems to apply to new construction or the repair of the actual defect which ultimately causes the worker's injury. We prefer the general formulation of the exception which the trial court extracted from *Holdaway v. Gustanson*, 546 F.Supp. 231, 233 (D.Wyo.1982) and which we repeated in the text above.

**3.** Restatement, Second, Torts § 414 comment (a) states:

"If the employer of an independent contractor retains control over the operative detail of

doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant [respondeat superior]. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent

"To determine whether the nature and extent of the control present is sufficient to impose liability, both the contractual provisions and the actual exercise of control are relevant. If the employer reserves and exercises only the right to inspect the construction work to see that the contract specifications are met while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject it to liability. Similarly, if the employer retains only [the right to require that the contractor observe safety rules and practices] but assumes *no* affirmative duties and never directs the method of performance, there is insufficient control or supervision to render it liable.

"On the other hand, if the employer retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety, the employer has retained sufficient control to be held liable if he exercises that control negligently." (Citations omitted and emphasis added.) *Moloso v. State*, Alaska, 644 P.2d 205, 211–212, 29 A.L.R.4th 1165 (1982).

The district court granted summary judgment to Chevron because appellant was injured while performing the very work the independent contractor, Automation, was hired to perform. Factually, the court's conclusion cannot be faulted. Even when the summary judgment materials are read in a light most favorable to appellant, it is clear that he engaged in the very work that Automation was hired to perform when he painted the H frame. Nevertheless, we must reverse. As a matter of law, the exception applied by the district court must be tempered by the theory of retained control. We hold that an owner of a work site who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the contractor was hired to perform.

Although the safety provisions of the Chevron-Automation contract may not have given Chevron enough control to create a duty of reasonable care, Chevron's actual control over the energizing of the power lines was sufficient to create a duty as a matter of law.[4] Appellant's foreman explained in his deposition that Automation had developed a working agreement with Chevron which prevented Automation crews from de-energizing lines without Chevron's permission. If one of Automation's foremen decided that a line had to be de-energized, he would contact Chevron's office to obtain permission. If a secondary line was involved, a line that did not power important oil well operations, Chevron required permission just so its employees would know which secondary lines were usable. With primary lines, however, Chevron might actually deny permission to de-energize so that its operations would not be interrupted. On at least one occasion Chevron refused to allow de-energization of a primary line. Chevron's chief engineer made it clear to appellant's foreman that Chevron did not want the primary lines de-energized unless it was absolutely necessary because those lines were needed to keep wells operating.

Appellant's foreman stated in his deposition that the line which injured appellant was a secondary line with a primary load which he treated as a primary line. It is possible that Chevron would have denied permission to de-energize the line if the foreman had requested permission. And it would have taken at least an hour to obtain permission even if granted. Under these circumstances, appellant's foreman decided

the work which he has ordered to be done from causing injury to others."

4. We have analyzed the summary judgment materials in a light most favorable to appellant, the party opposing the motion. *Noonan v. Texaco, Inc.*, supra, 713 P.2d at 162. Our conclusion that Chevron had sufficient control over the power lines may not be borne out when the conflicts in the depositions and affidavits are resolved at trial.

not to request de-energization prior to appellant's injury.

Chevron's control over de-energization of primary lines could have contributed to appellant's injury even though appellant's foreman never requested de-energization. If Chevron had not discouraged de-energization of the primary lines, if it had made permission easier to obtain, and if it had permitted de-energization whenever requested by Automation—vesting the decision to de-energize and thus control in Automation—then appellant's foreman might have de-energized and the injury might have been avoided. Chevron retained enough real control to raise a duty of reasonable care. Whether Chevron breached that duty and whether its breach caused the injury are additional questions whose answers might absolve Chevron of liability. But Chevron was not entitled to summary judgment on the duty issue.

## BREACH OF DUTY

■ Because Chevron owed appellant a duty of due care as a matter of law, Chevron was entitled to summary judgment only if the affidavits and depositions establish that one of the other elements from appellant's negligence case is missing. In its summary judgment order the court stated:

> "There is evidence that Chevron had control over decisions whether to de-energize the line. However, Automation & Electronics made the decision not to ask Chevron to de-energize the line, so Chevron knew nothing of it."

In other words, the court held that there was no issue of material fact involving the "breach of duty" element because Chevron did not know that Automation was painting the H frame while it was energized. We disagree for two reasons.

First, there was conflicting evidence in the summary judgment materials with respect to the engineer's presence immediately before the accident and with respect to what occurred at that time. How that conflict is resolved and what reasonable inferences can be drawn from the situation is a matter for the jury unless the evidence is such that reasonable minds could not differ as to its effect. It is possible that Chevron's chief engineer, Bob Kiyoi, was present at the accident scene. It is also possible that Mr. Kiyoi knew the line was energized and that appellant was preparing to paint the platform. If these facts are proven at trial, then the jury might find that Chevron breached its duty of care when its agent, Mr. Kiyoi, failed to exercise his authority by shutting down the line or warning appellant of the danger. Of course, Automation's failure to request shutdown, appellant's own awareness of the danger, and appellant's failure to ask whether the line was energized, could reduce the level of fault, if any, attributable to Chevron. But that is a comparative negligence question that must be left to the jury.

Second, if no Chevron employees were at the scene of the accident, Chevron may have nevertheless breached its duty of care by adopting de-energization procedures which deterred appellant's supervisor from requesting that the power be shut off. Then the jury will have to decide whether the procedures were reasonable under the circumstances and to what extent the procedures caused the harm. As we said in *Bancroft v. Jagusch*, Wyo., 611 P.2d 819, 821 (1980),

> "[s]ummary judgments are not proper in negligence actions when the question is whether or not the defendant's actions violate the required duty. [That] is a question of fact."

## OBVIOUS-DANGER RULE

■ The trial court did not base its holding of "no duty" entirely on the rules discussed above. The court held in the alternative that the obvious-danger rule negated Chevron's duty of reasonable care to appellant. Under the obvious-danger rule, an owner of property has no duty to his invitees "to correct an obvious and known danger resulting from natural causes." *O'Donnell v. City of Casper*, Wyo., 696 P.2d 1278, 1282 (1985); see also Note, The

Obvious Danger Rule—A Qualified Adoption of Secondary Assumption of Risk Analysis, 21 Land & Water L.Rev. 251 (1986). But the obvious-danger rule does not apply when a dangerous condition is created by the owner or his servants. *O'Donnell v. City of Casper*, supra, at 1283.[5] In this case, neither party contends that the transformer was dangerous from natural causes. It was dangerous, if at all, because of the way it was designed, constructed, maintained, or operated. Even if the danger was perfectly obvious to appellant, it is the function of the jury, under the comparative negligence statute, to compare his negligence with that of Chevron. *O'Donnell v. City of Casper*, supra, 696 P.2d at 1284. Chevron should not have been granted summary judgment as a matter of law based on the obvious-danger rule.

## VICARIOUS LIABILITY OF AN OWNER

■ Although we have concluded that Chevron's direct duty to appellant precluded summary judgment, we must still discuss Chevron's potential vicarious liability because it could have a very real effect on Chevron's liability after remand. See *Conover v. Northern States Power Company*, supra, 313 N.W.2d at 403. For example, if the jury concludes that 35 percent of the fault is chargeable to Chevron, 25 percent to Automation, and 40 percent to appellant, then appellant can recover from Chevron under comparative negligence only if Automation's fault is imputed to Chevron. Chevron would then be 60 percent at fault compared to appellant's 40 percent. See § 1–1–109, W.S.1977; *Board of County Commissioners of County of Campbell v. Ridenour*, Wyo., 623 P.2d 1174 (1981).

Although appellant claims that Chevron retained some control over the electrical lines, he concedes that Automation was an independent contractor rather than a Chevron employee. Generally,

"the employer of an independent contractor is not responsible for the contractor's inadequate acts unless the employer did not use due care in selecting the contractor." *Cline v. Sawyer*, Wyo., 618 P.2d 144, 148 (1980). See also Restatement, Second, Torts § 409.

But many exceptions to this rule have been recognized which prevent an owner from delegating his duty of care to an independent contractor.

Both appellant and the Wyoming Trial Lawyers Association, who submitted an amicus brief, argue that Chevron should be vicariously liable to appellant for Automation's negligence because the electrical work contracted to Automation was inherently dangerous. They urge us to adopt §§ 416 and 427 of the Restatement, Second, Torts which simply restate the time-honored rule that an owner cannot delegate to an independent contractor the duty to protect others from "inherently dangerous" activities conducted on the owner's land. See W. Keeton, Prosser and Keeton on Torts § 71 at 512 (1984). Section 416 states:

"*Work Dangerous in Absence of Special Precautions.*

"One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

Similarly, § 427 states:

"*Negligence as to Danger Inherent in the Work.*

5. In *O'Donnell v. City of Casper*, Wyo., 696 P.2d 1278 (1985), we stated that the obvious-danger rule, as broadly formulated in *Sherman v. Platte County*, Wyo., 642 P.2d 787 (1982), did not survive the enactment of comparative negligence. We overruled the cases cited in *Sherman v.*

*Platte County*, one of which was *McKee v. Pacific Power and Light Company*, Wyo., 417 P.2d 426 (1966). In *McKee* we had applied the obvious-danger rule to harm caused by electric wires, a man-made hazard. 417 P.2d at 427.

"One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

Many courts have applied the "inherently dangerous" exception, as synthesized in §§ 416 and 427, when bystanders unconnected with the work are the "others" who are injured. But most jurisdictions that have decided the issue have refused to apply the exception when an employee of the contractor is the injured party. *Tauscher v. Puget Sound Power & Light Company,* supra, 635 P.2d 426, 429 and n. 2. There are several good reasons for this view. First, if a bystander is injured by the negligence of a financially irresponsible contractor, the owner may be the bystander's only source of recompense. The bystander is a totally innocent third party having no involvement in the work; and, if it is inherently dangerous and likely to cause harm, the owner undertaking the work should be responsible for the harm. The employee, on the other hand, is covered by worker's compensation even if the contractor is insolvent. The owner should not have to pay for injuries caused by the contractor when the worker's compensation system already covers those injuries. *Sloan v. Atlantic Richfield Company,* Alaska, 552 P.2d 157, 160–161 (1976). The owner "has in a sense already assumed financial responsibility for the injuries" because the independent contractor passes along his worker's compensation costs to the owner. *Tauscher v. Puget Sound Power & Light Company,* supra, at 430; *Eutsler v. United States,* 376 F.2d 634, 636 (10th Cir.1967).

Second, under worker's compensation, an employer is released from tort liability for his employee's job-related injuries. If we held an owner vicariously liable for injuries to the contractor's employees, then the owner would be subject to greater liability than if he employed his own workers to do the job. Owners might be encouraged to use their own inexperienced employees instead of experienced independent contractors who specialize in hazardous work. *Tauscher v. Puget Sound Power & Light Company,* supra, at 430–431.

Finally, if the owner maintains control over the work and exercises that control negligently, he can be directly liable to the employee for his own negligence. Rather than imposing vicarious liability in these cases, it is better to hold the contractor and the owner directly responsible for their own fault. The contractor will pay via worker's compensation and the owner through the tort system. *Conover v. Northern States Power Company,* supra, 313 N.W.2d at 405.

We agree with the district court that §§ 416 and 427 of the Restatement, Second, Torts do not apply when an employee of a contractor is the plaintiff. The court properly granted summary judgment against appellant on his claim that Chevron was vicariously liable for the negligent acts of Automation.

## THE DISSENTING OPINIONS

Justice Urbigkit states that under the theory of retained control, which we outlined earlier in this opinion, "ownership and control become synonymous." He argues that

"[c]reation of the rule of control in the fashion implemented in this case creates the duty, since the owner will always have the opportunity to tell the expert how the expert should conduct his business."

We disagree. An owner does not "always" have the opportunity to tell the expert how to do the job. The owner may, by contract, totally rely upon the contractor to perform the work with whatever safety precautions the contractor chooses. If, in addition, the owner does not assume affirmative duties with respect to safety while the contract is performed, then, under our holding, the owner has effectively relinquished control.

We look to the contract and the parties' actions during the period of performance to determine whether control has been retained. The owner's hypothetical opportunity to retain control before he executes or performs the contract is irrelevant.

In the case at bar, for example, there is no question that Chevron effectively relinquished control over the secondary lines when it adopted a policy of automatically approving any request by the contractor to de-energize. Chevron had no duty of care running to appellant regarding the secondary lines and, if he had been injured on a secondary line, Chevron would have been entitled to summary judgment. The fact that Chevron had the opportunity to retain control over de-energization of the secondary lines does not mean that Chevron actually retained such control.

Justice Urbigkit states that he is "concerned that the homeowner will assume liability for the electricians who work on the home without turning off the electricity." Under our holding this concern is easily allayed. The homeowner must retain the right to direct the electrician's work or assume affirmative duties with respect to safety before he owes a duty to the electrician to protect him from hazards incidental to the work. Few homeowners would tell the expert electrician how to do his job and few would assume affirmative safety duties. The typical electrician would not even ask the homeowner whether he could turn off the electricity. Both parties would assume that the contractor has the right to turn off the power if he thinks it is necessary. If the parties did not agree on the control aspect of their service contract, a court would undoubtedly imply reasonable terms on that subject. A complete relinquishment of control would be implied because it is the reasonable and likely intent of the parties. The homeowner would not retain sufficient control to create a duty of care with respect to the very work the electrician was hired to perform.

In the case at bar, Chevron owed appellant a duty of care with respect to the primary lines because Chevron, in a very real sense, retained control over them. In both dissents it is argued that Chevron did not have control over the de-energization of the primary lines because Automation simply had to make a request before they would be de-energized. Justice Urbigkit asks: "How can you make a request easier than a request, since in either case you only have to ask?" The short answer is that Chevron did not treat all requests equally. As noted above, Chevron automatically approved all requests for de-energization of secondary lines. These requests were a mere formality intended to tell Chevron which lines were de-energized. This request requirement did not give Chevron real control. But the requests for primary line de-energization were not mere formalities. Chevron discouraged such requests, took its time processing them (time which the contractor's employees might remain idle), and at times denied them. This is the kind of real control which implies corresponding responsibilities.

Of course, it may be that Chevron exercised its control over de-energization in a perfectly reasonable manner by establishing a proper policy and following it. But that is a decision for the jury which in negligence cases must usually decide whether the standard of care has been breached. Our holding does not create absolute liability as Justice Urbigkit claims. It resolves only the duty issue. Breach of duty, causation and damages are issues which remain to be adjudicated. The rule of retained control merely ensures that the duty to protect another's safety falls on the person who has the power to do something about it.

## CONCLUSION

Chevron owed a direct duty of reasonable care to appellant even though he was injured by a hazard incidental to the very work Automation was hired to perform. The duty arose because Chevron retained control over a safety matter—the de-energization of the power line. Chevron's duty to appellant was not limited by the obvious-

danger rule because the hazards were man-made. A dispute of fact existed over whether Chevron breached its duty of care to appellant. Summary judgment could not be based on that issue. The only issue properly disposed of by the district court on summary judgment involved Chevron's vicarious liability for Automation's negligence. The district court correctly held as a matter of law that §§ 416 and 427 of the Restatement, Second, Torts do not apply in Wyoming when the injured plaintiff is an employee of the contractor.

Affirmed in part and reversed in part.

BROWN, Justice, concurring in part; dissenting in part, in which URBIGKIT, J., joins.

I agree with the majority opinion's holding that:

"* * * [A]n owner of a work site who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the contractor was hired to perform."

I cannot agree, however, with the majority's application of the law in this case with regard to Chevron.

We recently recognized that an owner may may retain control over certain safety aspects of an independent contractor's performance without destroying the independent contractor relationship in *Noonan v. Texaco*, Wyo., 713 P.2d 160 (1986).[1] There we found that even though the owner retained the right to require the individual contractor to use safe equipment, material and supplies, such was insufficient to destroy the individual contractor status. Moreover, we encouraged such a practice:

"* * * We think an owner who undertakes to see that an independent contractor operate in a safe manner ought not

be penalized. The reservation of a right to require safe equipment, material, and supplies to be used by the contractor is not without justification or reason. The owner has a vital interest in assuring himself that his well will be drilled efficiently, in a good workmanlike manner, at a reasonable cost, and that the final result is as good as possible. Good, safe equipment is a substantial factor in insuring that performance. But, a simple reservation of a right to inspect and secure that benefit does not cause the contractor to become the owner's employee, for the owner has not taken over the details of safety with respect to the contractor's employees.

"The contractor still accepts and reviews applications for employment, determines who to hire, presumably knows which potential employees have accident records and their past employment history. The contractor-employer is responsible for safety training of his employees and for training them in the performance of their work. He provides safety equipment and manuals and retains the right to discipline or even discharge them for unsafe practices. The details of safety being in control of the contractor rather than Texaco, it is apparent to us that Texaco's minimal, and we feel necessary, involvement in safety did not result in the contractor becoming Texaco's employee so that Texaco became liable to appellant under the doctrine of respondeat superior." Id., at 167.

When reviewing a summary judgment on appeal, this court sits in the same position as the district court, using the same material and following the same standards. A party moving for summary judgment has the burden of proving the nonexistence of a genuine issue of material fact. A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or de-

---

1. I realize the *Noonan* case involved an injury caused by an instrumentality owned by the independent contractor, not the owner as here. Nevertheless, the language as to the owner retaining limited control over the safety aspects of the individual contractor's performance is applicable here.

fense asserted by the parties. Upon review of a summary judgment, we view the record from the vantage point most favorable to the party opposing the motion. *Noonan v. Texaco*, supra; *Garner v. Hickman*, Wyo., 709 P.2d 407 (1985); *Dudley v. East Ridge Development Company*, Wyo., 694 P.2d 113 (1985).

In the present case the following facts are undisputed. Automation and Electronics, Inc. (Automation) was an individual contractor for Chevron hired to erect power lines. If Automation wished to have the power turned off, it made such request to Chevron. On the day of the accident, appellant was assigned to paint the metal supports of the H-Frame structure, which were located below the platform upon which the transformers sit. Appellant was not told to go on the platform, or paint any area which would require him to get on the platform. While painting, appellant crawled onto the platform and was injured when electricity arced through his body. Automation did not request a power shutdown before appellant proceeded with his task of painting the H-Frame supports. In my opinion, this is the crucial deciding fact in this case. As a matter of law, Chevron cannot be held liable for appellant's injuries when absolutely no request was made for a power shutdown, and Chevron did not know that appellant would get upon the platform. Whatever negligence there may be in the case, there simply is none that can be attributable to Chevron.

I agree with the majority's assessment of the law. There are circumstances under which an owner may be held liable for his negligence if he retains control over the work to be done. But in this case, such principles are misapplied. The procedure for a power shutdown was well established. To have the power turned off, Automation had to make such request from Chevron, and in this case, there simply was no request made.

Automation is in the business of electrical construction and it presumably possesses expertise in that field. Automation is presumed to understand the nature and inherent dangers of electricity. Insofar as Chevron is concerned, it matters not what appellant was told to do by his employer, Chevron had no control over appellant or the manner in which he performed his duties other than general safety considerations.

Appellant argues that Chevron, as owner of the premises, had a duty to provide safe working conditions on its premises for employees of individual contractors. *Abeyta v. Hensley*, Wyo., 595 P.2d 71 (1979); and 41 Am.Jur.2d Independent Contractors § 27 (1968). I agree with that abstract principle, but there is no showing that Chevron failed to do just that. Again, Automation failed to request that Chevron de-energize the power line. Simply having a power line on one's property is not negligent in and of itself.

In *McKee v. Pacific Power and Light Company*, Wyo., 417 P.2d 426 (1966), we upheld a directed verdict for the defendant power company when the plaintiff electrician was injured by a power line while working on a cable for a television company. The plaintiff contended, among other things, that the power company was negligent because it did not de-energize the line while the plaintiff was working on the television cable. Although the case was decided before the adoption of comparative negligence and its application to this case is limited, this court found it significant that neither the plaintiff nor his employer ever requested that the power be shut off. As to the liability of the owner, we stated: "In Wyoming, it is a settled rule that the owner of facilities is not an insurer of the safety of his invitees." *Id.*, at 429.

Having found no genuine issues of material fact, and there being no evidence that Chevron violated any duty, I would affirm the summary judgment in all respects.

URBIGKIT, Justice, concurring in part and dissenting in part.

I concur with the special concurrence and dissent of Justice Brown, and would add additionally.

Although I might have joined in the dissent of Justice Rose in *Noonan v. Texaco, Inc.,* Wyo., 713 P.2d 160 (1986), had I been serving as a member of the court at that time, it would seem from the present opinion of this court that Noonan lasted only these few months.

However, my concern arises not from the effect on Noonan by this decision, but that we now go much further than was even claimed as proper in the Noonan dissent.

This court cannot separate the present facts from the legal principle discussed. In result it would seem that a special area of near absolute liability devolves upon owners who employ experts to provide services in activities where carelessness invokes a particular risk of injury, such as electrical transmission companies or any other of the dangerous occupations which could even include the most dangerous of all locations, our personal home, where more accidents do occur.

This concern is not idly raised, since the court accepts neither *Holdaway v. Gustanson,* 546 F.Supp. 231 (D.C.Wyo.1982), rev'd sub nom *Holdaway v. Amoco Production Co.,* 751 F.2d 1129 (10th Cir.1984), nor the second case derived from the Circuit Court, *Holdaway v. Amoco Production Company,* supra, itself, by rejecting the exception rule for employees of an independent contractor as creating a duty to protect for hazards which are incidental to or part of the very work which the contractor was hired to perform.

I am concerned that the homeowner will assume liability for the electricians who work on the home without turning off the electricity, and each and every other occupational responsbility which invokes danger if carelessly pursued by the personnel of the independent contractor which have been selected for job expertise.

Seriously questioned is the rationale of the contention that justification for nonliability arises from lack of control. Creation of the rule of control in the fashion implemented in this case creates the duty, since the owner will always have the opportunity to tell the expert how the expert should conduct his business. Consequently, ownership and control become synonymous. As owner, some control over the jobsite exists by the fact of ownership.

By the court's own example in this case, a utility company would be responsible for injury to an independent-contractor employee, unless power was disconnected, even though a major societal adversity would result to the third-party user from the lack of electricity. The nature of the functioning economy does not always afford opportunity to disconnect service.

To otherwise define the result is to say that the decision in this case is determined by the way the rule is stated by the court. Obviously, an owner can always have the electricity turned off in order to have services performed. When an expert is employed, the necessity to disconnect should properly be in its hands and at its request. In this case, the tower painting operation did not invoke any unusual risk if approached with the expected realization that all electricity like dynamite, wild animals, motor vehicles, and construction operation, etc., can invoke an opportunity for injury if not approached with the expected care. Actually, Jones could have safely climbed up on the transformer platform itself if the extreme degree of care had been utilized for adequate grounding and adjacency determinations (two feet, as described by the testimony in the record).

Every square inch of each transformer platform is not necessarily dangerous, which is demonstrable by the fact that transformers are changed and electric utilities serviced, sometimes in very adverse climatic conditions.

The court, by the present opinion, has effectively promulgated a rule for owner absolute liability, even when experts are employed specifically to perform the necessary work. This decision is not supported by case authority. Although the majority cite *Wolczak v. National Electric Products Corporation,* 66 N.J.Super. 64, 168 A.2d 412 (1961), the present result in this case is directly contrary to that authority.

"The duty to provide a reasonably safe place in which to work is relative to the nature of the invited endeavor and does not entail the elimination of potential operational hazards which are obvious and visible to the invitee upon ordinary observation. [Citations.] This is especially so when the invitee is an experienced laborer hired either to correct the very danger present or to perform his tasks amidst the visible hazards. The landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which are part of or incidental to the very work the contractor was hired to perform. [Citations.]

"It is significant to note that each of the aforementioned decisions is explainable in terms of the equation, in *Meistrich v. Casino Arena Attractions, Inc.*, 31 N.J. 44, 48–50, 155 A.2d 90 (1959), of assumption of risk in its primary sense and lack of duty or failure to breach the duty owed. These doctrines, traceable to the law of master-servant, constitute a shorthand description of that species of occupational risk which, because of its obvious nature, its intimate relation to the task being performed, and the presumed expertise of the person encountering it, was formerly non-remediable if injury resulted and is now compensable solely through the medium of workmen's compensation laws. * * * The extension of this concept to the realm of the employer-independent contractor tort relationship is amply warranted by the obvious reliance of the employer on the skills of one hired to perform a task generally unrelated to the employer's own work." 168 A.2d at 417–418.

*Meistrich v. Casino Arena Attractions, Inc.*, 31 N.J. 44, 155 A.2d 90, 82 A.L.R.2d 1208 (1959), a case considered by this court in its opinion, affords a thoughtful and philosophic review of the basic theories and premises of the legal issues involved.

An obfuscation now occurs by creating a new principle of delegated control. In this case, Automation was contracted to build an electrical transmission system which included painting the required towers. Such painting, which was not completed by the time of initiation of use, was being done thereafter in an operation in the proximity of an activated electrical system. Although the painting activity then remained as a part of the original construction requirement, it will likely be hereafter repeated by other contractors as maintenance during the life of usage if the oil field has a sufficiently extended life. Then, or hereafter, carelessness is always dangerous in electrical service work, as in many other occupations. Care and knowledge by the employed expert is the expectancy of the bargain whereby the contractor is employed. It is clear from the present record that no reason existed for Jones to climb on the platform.

*Holdaway v. Gustanson*, supra, which the court previously approved in *Noonan* as stating the proper rule despite reversal by the Circuit Court, stated:

"Futhermore, Amoco is not obligated to protect the employees of CWS from hazards which are incidental or part of the very work which CWS was hired to perform. *Vecchio [v. AnHeuser-Busch*, 328 F.2d 714, 718 (2d Cir.1964).] The activity which led to the injury was conducted by CWS and the danger arises out of the activity itself. In such a situation, the responsibility is that of CWS and not Amoco." 546 F.Supp. at 233.

That principle, in itself, was not reversed by the Circuit Court which in *Holdaway v. Amoco Production Company*, supra, stated:

"* * * Regardless of whether the contract purports to make CWS an independent contractor, however, it will not protect Amoco if it may be inferred from facts and circumstances revealed by the evidence that the real relationship be-

tween Amoco and CWS was that of master and servant." 751 F.2d at 1130.

Control and supervision, not control alone as presumed from ownership, is the test for liability without regard for the exception rule quoted in *Holdaway v. Gustanson* of the expert employed to perform the work from which the dangerous exposure arises. *McKee v. Pacific Power & Light Co.*, Wyo., 417 P.2d 426 (1966); *Parsons v. Amerada Hess Corp.*, 422 F.2d 610 (10th Cir.1970); *Texaco, Inc. v. Pruitt*, 396 F.2d 237 (10th Cir.1968). See also *Sherman v. Platte County*, Wyo., 642 P.2d 787 (1982); *Bluejacket v. Carney*, Wyo., 550 P.2d 494 (1976); *LeGrande v. Misner*, Wyo., 490 P.2d 1252 (1971); and *Watts v. Holmes*, Wyo., 386 P.2d 718 (1963).

Factually, what is announced by the court in this case as its decision is that Chevron, in the absence of any request, should have made it easier for Automation to have requested that the operation of the oil field be shut down to avoid danger to a careless employee who might be climbing on a transformer platform, so that the tower and support underneath could be painted. How can you make a request easier than a request, since in either case you only have to ask?

Despite this writer's disafinity for disposition of negligence actions by summary-judgment decision, it is submitted that the decision of the trial court in this case was appropriate and well justified.

In reversal of the trial court, we now create a new rule with nefarious and indeterminate implications. It would seem that this court sets the law adrift somewhere between the Sargasso Sea [1] and Matagorda County, Texas. Compare this writer's dissenting opinion in *DeJulio v. Foster*, 715 P.2d 182 (1986), with On the Docket, "There is more to the mess in U.S. courtrooms than greedy attorneys and vindictive juries. Consider ..." Greene, *The hanging judges of business*, Forbes, April 7, 1986, at 62, 64, wherein Matagorda County, Texas, is described as, "Where plaintiffs

rule," as the article attributes proportionate judicial responsibility to the present litigious status of our society.

---

1. See *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), and *State v. Carter*, Wyo., 714 P.2d 1217, 1222 n. 2 (1986), Urbigkit, J., dissenting.