Donald BURTON, Appellant (Plaintiff),

v.

FISHER CONTROLS COMPANY, a corporation; Olman-Heath, a corporation; A.J. Deans; and G. Wayne Pierce, dba Pierce Construction Company, Appellees (Defendants).

No. 84–43.

Supreme Court of Wyoming.

Aug. 7, 1986.

P. Richard Meyer, Wayne Godare of Spence, Moriarity & Schuster, Jackson, for appellant (plaintiff).

Glenn Parker, James Applegate, Thomas A. Nicholas of Hirst & Applegate, Cheyenne, for Olman-Heath.

John D. Rossetti of Greenhalgh, Bussart, West & Rossetti, Rock Springs, for A.J. Deans.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

This case comes to the court for reconsideration upon rehearing by the present court. We reverse the prior opinion, *Burton v. Fisher Controls Company*, Wyo., 713 P.2d 1137 (1986), and sustain the decision of the trial court by affirming the twelve-member jury verdict.

Analysis of the facts may clarify the decision which we now make in this case involving an oil-field accident which oc-

curred at a gas well site in the Hay Reservoir area of Sweetwater County on March 8, 1977 by explosion of a "Type 630 Big Joe" gas pressure regulator from excess gas pressure.

Pleading and court file records encompass 1167 pages. Extensive discovery was pursued, and a six-day trial ensued, after which the jury found no negligence against any of the defendants then remaining in the lawsuit and no negligence against two other prior defendants for whom settlement and dismissal had occurred.

Some understanding of the cast of participants is required in order to adequately consider the issues presented. Plaintiff, Donald Burton (Burton), age 48 at the date of the accident, was a field foreman for Davis Oil Company (Davis Oil), and

" * * * had been employed in the oil business for 25 years. At one time he had his own drilling company. At all times material herein, he considered himself to be knowledgeable about and experienced with high pressured gas wells, including those wells located in the Hay Reservoir gas field.

\* \* \* \* \* \*

"6. Donald Burton was the production foreman in charge of the Hay Reservoir Well # 3, where the accident occurred. In that capacity he supervised, directed and controlled the activities of defendants H & H Services, Olman Heath Co., and Pierce. In his capacity as production foreman, Donald Burton had the responsibility and authority for inspecting and approving all construction and maintenance work performed on Well # 3." [1]

A.J. Deans was the Davis Oil district production superintendent for the area, and Burton's immediate supervisor. James McCrae was an initial defendant and a co-worker of Burton, with a generally comparable Davis Oil line of responsibility as a field foreman, and was amended out of the litigation by the first amended complaint. The partners in Davis Oil were named as

defendants in the second amended complaint and then amended out by exclusion in the third amended complaint.

Fisher Controls Company (Fisher Controls) was the manufacturer of the gas regulator equipment which blew up and caused the injury. H & H Services, Inc. (H & H) was a roustabout firm in the general area which provided variant construction and engineering services for available drilling companies and was responsible for the initial installation of the unit. National Supply Company was named as a third-party defendant and was the retail dealer from which H & H, by order of Burton and on the Davis Oil account, secured the regulator for installation at the well-site. Pierce Construction Co. was also a roustabout company and involved in aspects of the installation in January, with a representative onsite on the day of the accident. Olman-Heath was not involved in the January installation, and came in March to reinstall a downstream methanol pump for which the entire rigging had been constructed in January.

At trial, after settlements filed on the date of commencement, the only remaining participants in the litigation were plaintiff, Olman-Heath, the roustabout contractor which had installed the methanol pump the day before the accident, and A.J. Deans, the area supervisor for Davis Oil.

In pretrial motion activities, the court had sustained a motion for summary judgment in behalf of H & H, from which decision an appeal was attempted, and had denied similar motions in behalf of Fisher Controls, Olman-Heath, and Pierce Construction Co. (Pierce). Plaintiff then settled with H & H on the pending appeal, and with Fisher Controls and Pierce, immediately before trial date.

Defendant's fourth amended complaint was filed on the first day of trial for the purpose of amending out of the complaint and caption prior references to defendants with whom settlements had been made or otherwise deleted from the litigation, and

---

1. Taken from a joint pretrial statement submitted before pretrial conference. By that status, the facts stated are determined beyond question.

to leave in the document only plaintiff Burton and defendants Olman-Heath and Deans. No written motion to amend was made, and the oral motion was denied as belated. Additionally added in this last amendment were punitive damages.

Simplistically stated, the regulator was manufactured by Fisher Controls and purchased by National Supply Company for resale as an independent dealer of oil-field equipment and supplies. Harold Hood of H & H was employed by Burton to make the installation on the well in January, 1977, and for this purpose went to National Supply Company and acquired the equipment authorized by Burton on the credit of Davis Oil. The design, parts and configuration of the installation were determined by Burton, to be utilized for the purpose of furnishing well gas as a drilling fluid to drill a new well, Hay No. 4. The particular hookup involved using surplus gas which emigrated from the drill stem to the casing for the purpose of operating a fluid pump which was then used to pump methanol into the well to obviate freeze-ups which were occurring, so that a steady gas supply for drilling could be obtained. The hookup operated successfully in the January period, but the drilling operation of Hay No. 4 went awry, with a stuck drill stem, the usage of Hay No. 3 was consequently discontinued, and the well was shut down. The record contains no evidence of on-site inspection of the methanol equipment by Deans before the accident occurred.

A month or so later, in March, the company in the Denver office determined to commence drilling of Hay No. 5, and Burton was again directed by company officials from Denver, not Deans, to reready Hay No. 3 to make available gas for the drilling purposes in the new well site, Hay No. 5, which included reconnection of the fluid pump. The record simply does not demonstrate with certainty whether the regulator had been removed, but clearly the downstream methanol pump required reinstallation and reactivation, for which purpose Olman-Heath was employed on March 7.[2] When Olman-Heath installed the pump, the upstream regulator was already in place, and reason would suggest it probably had not been removed earlier. It did not make any difference, since clearly none of the defendants accepted responsibility for regulator reinstallation, or, by company records, were paid for the service. Pump installation was completed that evening, and the facility seemed to be working suitably, as had been the case with the earlier usage in January.

The record was not clear as to whether the pump was reciprocal, centrifugal or diaphragmatic, but it was powered by gas pressure, not internal combustion. The speed of its operation for injection of methanol into the gas well stem was controllable by adjustment of the regulator or the immediately adjacent downstream needle valve. This system for injection of methanol into the gas well stem for de-icing upon gas production was not an unusual oilfield system, with the regulator required in order to reduce and maintain a constant pressure for pump operation.

On the following day, Wayne Pierce, who was responsible for other roustabout construction activities, primarily pipe-line construction, in order to make the well available for the drilling operation in Hay No. 5, met Burton and Richardson, a representative of Olman-Heath, and told them that the methanol pump was frozen up and working erratically. Burton and Richardson then went to the well shed where the well head and equipment were located, and

---

**2.** The primary basis of the H & H dismissal on summary judgment by the court substantially before trial was its conclusion from the evidence that someone had removed the regulator earlier installed by Hood in January. This subject was then considered in in-limine discussion immediately before the trial, with Burton contending that nothing that occurred in January would now be material after the H & H dismissal and the immediately earlier settlement with Pierce and Fisher. The trial evidence that followed completely failed to show that Olman-Heath (or anybody) had reinstalled the regulator. The only services shown to the jury by trial evidence were reinstallation of the downstream methanol pump and reactivation of the system by Randy Richardson of Olman-Heath by direction of Burton on March 7.

examined the system. After examination and discussion of freeze-up solutions, Burton told Richardson to go out to the end of a discharge pipe, some distance away, to remove a nipple so that a free flow of gas could be arranged in order that the piping and equipment could be "blown out" and ice discharged.

Before Richardson was able to walk to the end of the pipe where his work was to be done, he heard a noise, and the regulator within the structure had obviously exploded, with a piece of the unit flying off and striking Burton in the head, resulting in serious injuries and subsequent permanent disabilities.

In order to understand the case, a couple of things about the trial process are also required knowledge. Burton did not testify at trial as to the events of the accident, although he did testify about his injury, and had earlier given both a statement and a deposition. The statement is in the record, but the deposition is not included. Consequently, the only trial witnesses to the occurrence in any immediate fashion were Pierce, who had seen the facility operating, and Richardson, who entered the structure with Burton.

At trial time, with the settlements then completed, the remaining defendants only included Olman-Heath, the party installing the methanol pump downstream from the regulator but not the regulator, and Downs as the area supervisor, but not the company official who had directed reconnection by Burton. The law of the case was established in a colloquy held immediately before trial commencement by the motion-in-limine discussion. Counsel for Burton advised the court:

" * * * Now our contention is that what happened in January in the prior installation of the regulator isn't material in this case, and let me tell you why.

"The case is really about how the regulator was installed and how much pressure was placed against it. The way the regulator was installed in March and the way the pump attached to it was installed in March is going to be the question for the jury. The question will not be what was done in January, nor will it be what other things Mr. Burton may have done in his capacity in the oil patch which Defendants want to say are wrong. If indeed Mr. Burton did anything that was wrong in January, it was on a prior installation when the regulator was taken off, and it's immaterial and irrelevant as an issue in the case; as we see the issues in the case." [3]

Consequently, the case went to trial on a question of whether Olman-Heath did something negligent in the installation of the downstream methanol pump or by failure to warn, without responsibility for the installation of the upstream regulator or other gauges and controls. Trial testimony was, however, given by a representative of H & H, Hood, that he had warned Burton in January that the regulator was not safe for the purpose intended by Burton, and had then been directed by Burton to make the installation without regard for the warning. As indicated in the prior opinion, supra, the gas pressure was significantly excessive for the regulator, and particularly so if the system was closed downstream so that a flow-through capacity ceased.

Evidence clearly demonstrates that the pump was working, albeit reluctantly or

---

3. The record reflects that the motion-in-limine discussion held before trial, included:
  1. January installation of the regulator by H & H;
  2. testimony about the replacement of the regulator after January and before the March accident;
  3. plaintiff's status in regard to Fisher Controls and Pierce, with a contention that their activities were no longer material;
  4. other installations by Burton on other wells (ten in number).

The decision of the court was:
  "I'm going to let you [defendants] testify as to this January installation, and I'm going to let you ask him if he's installed regulators before, and that's all."
It was clear that the incidents of negligence as to remaining defendants would only involve the March reinstallation, which would not include any physical involvement of either of them with the regulator except its incidental relation within the methanol pump system.

irregularly, at the time when viewed by Burton and Richardson shortly before the accident, requiring a conclusion that the valve between the two system units was open. The evidence further reveals that the valve was found to be closed after the accident, and that Burton was the only person available who could have done it.

Defendant Olman-Heath stated in closing argument, and it could have been accepted as reasonable by the jury, that the only person who could possibly have closed the valve was Burton, and this would have occurred immediately before the excess pressure would have blown the insufficient regulator not built for the closed-in pressure then resulting.

It has to be recognized that since the jury was only afforded a question of negligence in the March installation, the verdict which they rendered could not reflect the continuing danger of the Burton designed facility except as to a duty existent in March for someone to warn Burton about the danger of his system.

At the close of all the evidence, a motion for directed verdict was granted in favor of Deans on the issue of gross negligence. On this basis, under Wyoming's Worker's Compensation law, no recovery would result. Consequently, with that directed verdict, the jury resolution and resulting fact was whether or not negligence would be determined in a percentage sufficient so that liability of Olman-Heath would result. Counsel made clear in final argument what the parameters of recovery would be. After enumerating small potential negligence percentages for other participants, counsel then advised the jury that with 100 percent total of fault for everybody, five percent for Pierce maybe, Deans ten percent, Fisher probably none,

> " * * * [i]in order for Donald [Burton] to get a verdict you must say that Olman-Heath's negligence was greater than Donald's. And if you find a percentage of negligence against Donald the verdict will be reduced by that percentage of negligence so that he will not receive the full verdict. If it's 90/10, 90% negli-

gence for Olman Heath and ten percent negligence for Donald, Donald will receive 90% of the verdict. If the percentage changes the percentage that he recovers changes until you get to the point where if you feel that his negligence is less than—is greater than Olman Heath's, then Donald would recover nothing."

In the initial appeal, three issues had been raised, and two of them comprehensively considered in the prior opinion. The third, which was not there considered and will not be considered here because of insufficiency of a basis to justify discussion, was:

> "Was it error for the jury to reach a verdict of no negligence as to defendant Olman-Heath when the non-conflicting evidence admits only the conclusion of negligence?"

See *DeJulio v. Foster*, Wyo., 715 P.2d 182 (1986).

Categorically, the issues presented are:

A.   Error in the directed verdict in favor of Deans on gross negligence; and

B.   Error in the way the instructions were submitted, which might have reflected that settled-out defendants were still subject to a claim in some fashion by their terminology designation.

### Gross Negligence of Deans

■   It is interesting to contrast how counsel for Burton critiqued the potential negligence of Deans on final argument, to the present appellate submission.

The critique originally, after the trial evidence had concluded:

> " * * * I think too, that the involvement of Mr. Deans and Mr. Pierce is quite small, and I have to admit that in the case against Mr. Deans there was little evidence that he knew the regulator was on the well,"

contrasts with the statement in the brief:

> " * * * plaintiff was denied the opportunity of a jury determination on an obviously conflicting set of facts upon which reasonable men could surely differ."

First and best stated, the trial court listened to opening statements and was afforded the panorama of trial presentation. Having earlier denied a motion for summary judgment, the court was certainly aware of the criteria and facts for later decision.

There was not only little evidence, there was actually *no* evidence that Deans knew anything about the hookup and its characteristics or components, all of which had been determined, arranged, approved, installed, and supervised by Burton.

The basis of contention about the gross negligence is that Deans, as the general superintendent, should have warned Burton about high gas pressure at the wellsite, which facts were determinable by casual examination of a pressure gauge which was, incidentally, the method of the determination by Pierce. Deans was not the operating official—that status belonged to Burton. Deans was the office supervisor. Likewise, there was no evidence that Deans was informed by anyone about the January warning given Burton by Hood that the Fisher Controls regulator was improper for the high pressure existent in the system.

Simplistically stated, the issue is whether there is gross negligence in the failure to tell an expert how to do his job, as distinguishable from the current decision of this court involving the issue of ordinary negligence. *Jones v. Chevron U.S.A., Inc.,* Wyo., 718 P.2d 890 (1986). That decision might accommodate ordinary-negligence questions, but certainly did not encompass any possibility of gross negligence. In our opinion, the absence of evidence of Deans' knowledge of the characteristics of the Burton designed facility is determinative of the issue of Deans' gross negligence to Burton.

Sequentially there is no trial evidence of any discussion between Deans and Burton about Hay No. 3 or the methanol pump between the time of the Denver office reconnection directive and the time of the accident.

> "The master is not, however, liable for a failure to furnish a safe place to work if the complaint centers upon a danger

which the employer does not know of and concerning which he is not chargeable with knowledge, or which arises in the progress of the work and constitutes part of its details and risks." *Mellor v. Ten Sleep Cattle Company,* Wyo., 550 P.2d 500, 504 (1976).

Some weight should surely be afforded in assuming that final argument does not absolutely control jury decision, that if there had been a reasonable basis for the jury to have determined that Deans was guilty of gross negligence they would have at least determined that he was guilty of ordinary negligence. The curative effect of a directed verdict by confirmatory jury verdict cannot realistically be ignored. *Buckeye Powder Co. v. DuPont de Nemours Powder Co.,* 248 U.S. 55, 39 S.Ct. 38, 63 L.Ed. 123 (1918); *DeJulio v. Foster, supra; Crown Cork & Seal Co., Inc. v. Admiral Beverage Corp.,* Wyo., 638 P.2d 1272 (1982); *ABC Builders, Inc. v. Phillips,* Wyo., 632 P.2d 925 (1981); *Palmeno v. Cashen,* Wyo., 627 P.2d 163 (1981). See also *Whitt v. Farley,* Ky., 275 S.W.2d 906, 50 A.L.R.2d 990 (1955).

We conclude that the trial court properly exercised his discretion. If the jury had leaped over its no-negligence finding to hold gross negligence existent, that result could not have been sustained on this record. *Nehring v. Russell,* Wyo., 582 P.2d 67 (1978); *Moore v. Kondziela,* Wyo., 405 P.2d 788 (1965); *Altergott v. Story,* Wyo., 388 P.2d 196 (1964).

*Settled Defendants' Designation for Trial Purposes*

Burton designates this argument as:

"Was it fundamental error for the trial judge to instruct the jury that plaintiff was still making a claim against defendants with whom plaintiffs had previously settled?"

This court would rather define this question as whether or not confusion significantly inhibited the contemplation decision of the jury or misstated what would be

required of the jury in rendition of the verdict.

The supposition of jury error or confusion calls into question far less knowledge and lesser sophistication for that jury than realistically can be justified as a matter of ordinary logic. Voir dire examination was not reported, so the constituency of the twelve-member jury is not present in the appeal record. However, in Sweetwater County, Wyoming, some knowledge of litigation and oil-field activities would hardly be surprising. *Chavez v. State*, Wyo., 604 P.2d 1341, 1349 (1979), cert. denied 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980).

The case was tried against the superintendent; the employee had job-site responsibilities, and the installer of the downstream pump had nothing to do with the unit which caused the injury. It would not have required a genius among the jurors to know exactly what the status of the litigation was, where neither the unit installer nor the manufacturer remained as claimed liable parties.

We do not now find a question raised by either appellant or the majority of the court in the prior opinion but that in some fashion it was necessary for the jury to assess the relative share of negligence as including Pierce and Fisher in the computation. Although we do not recommend or necessarily approve of the use of the continued designation of defendant in future cases

for settled-out participants, we simply find neither jury confusion nor error rationally resulting in this occurrence. The issue and confusion were well stated by counsel in further rebuttal final argument:

> "I want to talk to you about a trap that I see in this case again and I think you'll be able to see if you examine the verdict form when you go to the jury room, that the only way you can assess money damages in this case for Donald [Burton] is if you find against Olman Heath, and find Olman Heath to be negligent more than Donald. If you don't find against Olman Heath the verdict tells you that you don't even get to the question of damages. So it's really a case that boils down to being between Olman Heath and Donald and nobody else. * * *
>
> " * * * As to Fisher, and I think, I need to say that we searched everywhere after the case was filed, and by the evidence in the case we've elected to proceed against some people and not against others."

### Status of Wyoming Law

It is recognized that with passage of Senate Enrolled Act No. 4 by the 48th Legislature in 1986, Ch. 24, S.L. of Wyoming 1986, any decision we make at this time is limited to this case and causes of action that accrue before June 11, 1986.[4]

---

4. Chapter 24, S.L. of Wyoming 1986, reads:
   "Section 1. W.S. 1-1-109 is amended to read:
   "*1-1-109. Comparative negligence.*
   "(a) Contributory negligence shall not bar a recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if the contributory negligence of the said person is not more than fifty percent (50%) of the total fault. Any damages allowed shall be diminished in proportion to the amount of negligence attributed to the person recovering.
   "(b) The court may, and when requested by any party shall:
   "(i) If a jury trial:
   "(A) Direct the jury to find separate special verdicts determining the total amount of damages and the percentage of fault attributable to each actor whether or not a party; and
   "(B) Inform the jury of the consequences of its determination of the percentage of fault.

"(ii) If a trial before the court without jury, make special findings of fact, determining the total amount of damages and the percentage of fault attributable to each actor whether or not a party.
"(c) The court shall reduce the amount of damages determined under subsection (b) of this section in proportion to the amount of fault attributed to the person recovering and enter judgment against each defendant in the amount determined under subsection (d) of this section.
"(d) Each defendant is liable only for that proportion of the total dollar amount determined as damages under paragraph (b)(i) or (ii) of this section in the percentage of the amount of fault attributed to him under paragraph (b)(i) or (ii) of this section.
"Section 2. W.S. 1-1-110 through 1-1-113 are repealed.
"Section 3. This act applies to all causes of action accruing after its effective date.

To reconstitute the argument that divided the court in *Board of County Commissioners of Campbell County v. Ridenour*, Wyo., 623 P.2d 1174, reh. denied 627 P.2d 163 (1981), or the argument which was considered in great detail in *Kirby Building Systems v. Mineral Explorations Co.*, Wyo., 704 P.2d 1266 (1985), will serve little purpose in this case where the jury found *no* negligence, unless something in the nature of the instruction confused the factfinders as they assessed fault on the case submitted which only involved occurrences on March 7 and 8, 1977, resulting in the injury incurred.

Whatever might be the proclivity of the majority of the present court, we will leave for the legislature that which they have done and continue the law of Kirby and Ridenour for the interim period.

Those rules are:

1. All actors' (participants') fault, by percentage, shall be calculated by the factfinder, which was, in this case, a twelve-member jury.

2. The negligence of the nonparty as an actor from whom no recovery is sought is not directly compared separately, by percentage with any party for the litigants' liability determination. The percentage is jointly allocated within the total scope of fault responsibility for the purpose of determining whether the plaintiff may recover from any defendant or defendants by direct numerical comparison between parties. Otherwise defendants would be subject to a mathematically allocated responsibility for actors omitted from the total percentage computation.

3. Once the percentage of each actor's fault is known, within a total for all participants of 100 percent, the defendants from whom the plaintiff may recover, if any there may be, become apparent.

4. Allocation and offset factors which were the substantive issue in Kirby need not now be addressed in view of the jury

decision of no negligence of any participant.

Plaintiff submitted proposed additional Instructions Nos. 1, 6, and 2G, which were rejected, and a proposed verdict form.

Instruction No. 1 was inaccurate and incomplete in a most significant fashion in addressing Fisher Controls and not Pierce. Instruction No. 6 was inaccurate and incomplete in addressing only Burton and "defendants" and disregarding requirements of Kirby that enumeration and allocation of other "actors" was also required. Instruction No. 2G was inaccurate and incomplete in disregarding Pierce and by failure to accurately establish the relational responsibility of the fault computation for the determination of all potential liability for the remaining defendants among variant actors.

The verdict forms require comparison to assess possible jury confusion:

Proposed by the plaintiff:

"WE, the Jury, duly empaneled and sworn to try the above cause, do find as follows: (In answering the questions, check the appropriate line, or insert a percentage or amount, as indicated.)

"1. Q. Was Defendant Olman-Heath negligent?

Yes__No__

"2. Q. Was Defendant A.J. Deans grossly negligent?

Yes__No__

"3. Q. If you have not found Defendant A.J. Deans to be grossly negligent, do you find that Defendant A.J. Deans was negligent? (DO NOT ANSWER THIS QUESTION IF YOU HAVE ANSWERED QUESTION # 2 ABOVE 'YES'.)

Yes__No__

"4. Q. Was Fisher Controls Company negligent?

Yes__No__

"If your answers to the questions above are 'Yes' as to Questions # 1 *or* Question # 2, you will answer Question

"Section 4. This act is effective June 11, 1986."

# 5. However, if your answer is 'No' as to both Questions # 1 *and* # 2, you will proceed no further, sign the Verdict and return to Court. * * * "

Used by the trial court:

"WE, the Jury, duly empaneled and sworn to try the above cause, do find as follows: (In answering the questions, check the appropriate line, or insert a percentage or amount, as indicated.)

"1. Q. Were any of the following Defendants negligent?

| "A. | | | | |
|---|---|---|---|---|
| Fisher Controls Company | Yes | ___ | No | X |
| Olman-Heath | Yes | ___ | No | X |
| A.J. Deans | Yes | ___ | No | X |
| G. Wayne Pierce | Yes | ___ | No | X |

"If your answer to Question 1 is 'Yes' as to any Defendant, *except as hereinafter instructed in this paragraph,* you will answer Question 2. However, if your answer is 'No' as to all Defendants, or 'No' as to all Defendants except Deans, and is 'Yes' as to Deans you will proceed no further, sign the Verdict and return to Court. * * * "

The direct question for us to determine is whether the result would have been changed if the word "defendant" had been deleted and the word "actors" or "participants" substituted. Secondly, the question is raised whether the arrangement of the verdict was contrary to the requirement of Kirby. Burton premises the question in terms of basic trial fairness.

■ Excepting that the verdict form as given by the court to accommodate the directed verdict of gross negligence for Deans, not contemplated by the plaintiff's verdict form, and that for unknowable reasons Pierce was omitted by plaintiff, the forms are nearly identical except for the designation difference. Preferring as we might even with the settlements and dismissals occurring on the date of trial commencement, that the characterization of "defendant" for those for whom pretrial settlement is made or who otherwise are not actual litigants during the trial would have been better replaced by "actor," "participant," "antagonist," "doer," "taker," "sharer," "participator," or "partaker," we cannot find any prejudicial confusion.[5]

However, to the extent that this opinion may be of value in other cases, it is recommended that the designation used in the future be "actor," as is now specified in the newly enacted legislation.

Obviously, under Kirby, the percentage participation of each actor must be established in order for the liability, if any, of the remaining defendant parties to be mathematically computed.

■ We do not find that either the submitted form of Burton or the used form of the court was inappropriate as a general form whereby the jury could determine the required percentage participation.[6]

5. We do not ignore the trial colloquy clarifying the question of instructions:

"THE COURT: Also, I'd like the record to show that instruction number two which was objected to by Plaintiff has been changed apparently with the concurrence of all parties and instruction number seventeen has also been changed to point out that some of the former Defendants are not now Defendants in the action.

"MR. MEYER: All I wanted, Your Honor, is that when you gave the modified instruction that you were asked to give, part of the modified that we asked to give, was to make it clear that we weren't making claim against these people and I think that that instruction—

"THE COURT: Two and seventeen?

"MR. MEYER: I'm not sure.

"THE COURT: Also, instruction number ten has been included to set forth the duties of Olman Heath and Pierce. Anything else?

"MR. MEYER: Nothing."

The plaintiff did not exercise this opportunity, and accepted the critique of the trial court with subsequent adoption in final argument accordingly.

6. An academic inquiry for future cases is created as to whether the more appropriate arrangement would be to classify by actor and designate by given name or somehow otherwise clarify in the early part of the jury verdict as to who is only an actor and who is an actual defendant. In view of present statutory requirements that the jury be advised of the effect of their verdict, and the forthcoming provision of § 1–1–109(b)(i), W.S.1977, "Inform the jury of the consequences of its determination of the precentage of fault," it would seem that either through the verdict form or the statement of the

To avoid repetition by reiteration in this opinion, we determine that Justice Brown correctly analyzed the facts and properly applied the law in his consideration of the case in his dissenting remarks to the prior opinion, supra, 713 P.2d at 1146 et seq.

Lacking error in the directed verdict on gross negligence for Deans, or prejudicial confusion, or an erroneous statement of the law in the submission of the question of negligence to the jury resulting in their determination that the four listed participants were not negligent, *Cervelli v. Graves*, Wyo., 661 P.2d 1032 (1983), and *Ivinson v. Althrop*, 1 Wyo. 71 (1872), we reverse and vacate the prior decision, and affirm the jury verdict and resulting trial court judgment.

THOMAS, Chief Justice, dissenting.

I join with Justice Cardine in his dissenting opinion in this case. In addition I point out that the case has been before seven justices of the Supreme Court of the State of Wyoming. Initially three justices voted to reverse the case and an opinion reflecting that view was filed. Thereafter, a rehearing was granted which involved two different justices and they joined with a prior dissenting justice to form a new majority. It is my position that that style of divergence reflects that this was a close case in terms of a sufficiency of the record to justify a finding by the jury of gross negligence. It demonstrates that the case was so close that the jury should have been permitted to decide the issue.

CARDINE, Justice, dissenting with whom THOMAS, Chief Justice, joins.

I dissent for the reasons stated in the prior opinion of this court in *Burton v. Fisher Controls Company*, Wyo., 713 P.2d 1137 (1986). And, by way of additional comment, I note that the court cites *Jones v. Chevron U.S.A., Inc.*, Wyo., 718 P.2d 890 (1986) as support for the trial court's holding that the facts of the case as related to Deans, "did not encompass any possibility of gross negligence," but "might accommodate ordinary-negligence questions." *Jones v. Chevron* involved the independent-contractor issue and was decided upon summary judgment. In the instant case, before the judge ruled that as a matter of law the jury could not find gross negligence, the facts were fully developed by testimony of witnesses in a trial to a jury. That is quite a different circumstance from the summary judgment in *Jones v. Chevron*.

The majority then finds comfort in the fact that the jury not only did not find Deans grossly negligent, but declined to find that he was even negligent, and then states: "The curative effect of a directed verdict by confirmatory jury verdict cannot realistically be ignored." This scenario and statement brings into focus the precise complaint of appellant, i.e., that he was denied a fair trial by the court's ruling. The jury's verdict is confirmatory of nothing. When the court held, as a matter of law, that Deans was not grossly negligent, appellant could not, under any circumstance, recover from him. Thus it became necessary for him to argue that not only

issues the jury should be advised as to who among the actors had "available pockets" and who was included only for determination of the computation of responsibility. Perhaps a simple instruction which designates the actors and advises as to remaining defendants would amply serve this purpose. A cause for retrial of this case based upon the possibility of a preferential approach is certainly not justified, and particularly so since if this jury might have had any confusion it was clearly removed by the final argument made by counsel for Burton.

The real question derived from the complex appellate path of this case is trial strategy and procedure in consonance of comparative negli-

gence when plaintiff settles out with principal actors pretrial and then continues the litigation with the remaining participants. Should or can that general status be hidden from the jury?

In this case, where defendant Olman-Heath read into the record a deposition of plaintiff's expert witness who enumerated in great detail how unsuitable the regulator was and testified about the faulty lack of overpressure protection both upstream and downstream from the regulator, which deposition was taken by an attorney of Fisher Controls with participation by attorneys for Pierce and Olman-Heath, any effort to hide the settlement facts from the jury would be implausible.

was Deans not grossly negligent but that he was not negligent at all, for a finding of negligence against Deans would have meant that appellant had lost his case. Thus in his opening statement, appellant argued that Deans was grossly negligent, but when the case finally went to the jury he had to argue exactly the opposite, such argument being set forth verbatim on page 1218 of the majority opinion. As appellant's counsel stated in argument to this court, the jury must have thought he was crazy. His second objection was that although he was not seeking to recover from parties with whom he had settled, they nevertheless were shown on the verdict form as defendants in the lawsuit, and he was forced to attempt to explain to the jury that although they were shown as defendants, he was not seeking to recover against them. Again, this was an extremely confusing situation which placed him at a considerable disadvantage and must have affected his credibility in attempting to present his claim to the jury. I am convinced this court was right in its first decision in this case; and, therefore, I must dissent from the opinion of the court following rehearing.