**Rex ALLEN and Jeannine Allen, Appellants (Plaintiffs),**

v.

**SLIM PICKENS ENTERPRISES, a California corporation, and Maggie Lindley Pickens, a/k/a Margaret Elizabeth Lindley, Appellees (Defendants).**

No. 88–314.

Supreme Court of Wyoming.

July 28, 1989.

Stephen E. Weichman and William R. Fix of William R. Fix, P.C., Jackson, for appellants.

William T. Schwartz and William S. Bon of Schwartz, Bon, McCrary & Walker, Casper, for appellee Slim Pickens Enterprises, Inc.

Richard E. Day and Richard L. Williams of Williams, Porter, Day & Neville, P.C., Casper, for appellee Margaret Elizabeth Lindley.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and PATRICK, District Judge.

URBIGKIT, Justice.

Cowboy singer Rex Allen (Allen), then on his honeymoon, stopped at the Boulder Lake, Wyoming cabin of his long-time friend, Slim Pickens (Pickens). By association in prior years, Pickens had extended an open invitation to Allen to visit at any time and had apparently told Allen where the house key was secreted. Failing to find the key and falling on overgrown grass in the steps of the unoccupied cabin, Allen suffered injury which ultimately resulted in the loss of sight in one eye. Within this relationship and following the severe slip and fall injury, we are presented with a summary judgment denial of damage.

We affirm in analysis of the presented question of negligence and scope of duty of the property owner. Intrinsically involved is Allen's contention of failure:

[T]o maintain the stairway where the Appellant was injured in a reasonably safe condition, the Appellees failed to provide adequate maintenance of the stairway, the Appellees failed to warn of the unsafe condition existing upon the stairway, and that the Appellees were otherwise negligent in the management and maintenance of the stairway.[1]

Pickens, a nationally known actor, owned a summer retreat cabin at Boulder Lake in the mountains near Pinedale, Wyoming. Title to the property had been transferred to Slim Pickens Enterprises, a California corporation, which constitutes one of the two appellees in this case and the heirs of the deceased Pickens constitutes the additional appellees in present appeal. In general practice, the cabin was closed and winterized in the fall and reopened in the spring with the arrival of suitable weather for summer use when the utilities were turned on and yard grass surrounding the structure cut. Allen had visited the cabin in prior years and an open invitation to "stop by" with included instructions as to where a hidden key to the cabin might be found had been extended.

In the year of the accident, 1983, Pickens was seriously ill and the cabin had not been reopened for use. As a result, weeds and grass had grown up around the walkways and stairs, as well as the yard area. According to the record as accurately outlined in appellee Margaret Elizabeth Lindley's brief:

Every fall, the Pickens cabin was winterized, which included disconnecting the electricity, and draining the water. When someone was going to use the cabin, including Slim Pickens and Mrs. Lindley, they would call in advance to have the cabin opened up and the utilities connected. This included having the grass mowed, the cabin cleaned, and linens brought out. The cabin was not habitable after it had been winterized. * * *

* * * No one in the Pickens family used the Pickens cabin during the year 1983, since Slim Pickens was very, very ill at that time. * * * Slim Pickens died in 1983. * * *

* * * Since no one in the Pickens family used the cabin in 1983, and no guests had called to request to use the cabin, the cabin remained winterized during the summer of 1983, and the native grass around the cabin had not been mowed. * * *

* * * According to Mr. Allen, Slim Pickens had told him many times that if Mr. Allen was going to be in the area, he was free to come and stay at the Pickens cabin. * * * Although Mrs. Lindley was not aware of this open invitation, she does not doubt Mr. Allen's word with respect to this invitation. * * *

* * * Mr. Allen had no specific discussion with either Slim Pickens or his wife, Mrs. Lindley, about staying at the Pickens cabin in July of 1983, and in fact Mr. Allen doubted that either Slim Pickens or his wife even knew that he was going to be in the area at that time. * * *

For the occurrence itself and on the date of the slip and fall accident, Mrs. Lindley summarizes:

In July of 1983, Mr. Allen and his wife were driving in a motorhome from a family gathering in northern Arizona to Calgary, Canada. * * * The night before the accident, Mr. Allen and his wife stayed in Denver with his son. Mr. Allen decided at that time that the Pickens cabin would be a nice place to stay on his way north. * * *

* * * Prior to driving to Boulder Lake to the Pickens cabin, Mr. Allen stopped in Pinedale to see if Mike Nystrom's office was open. Mr. Nystrom was a friend of Slim Pickens, and Mr. Pickens

---

**1.** There was another issue presented in behalf of the listed defendant, Slim Pickens Enterprises. That corporation had been dissolved effective March 18, 1986 and apparently liquidated pursuant to California law. At the time the litigation was commenced, that corporate entity was not in existence. We need not pursue the issue to consider a proper party for litigation after a corporation is dissolved and assets liquidated in view of the disposition of this matter otherwise made. A defense on the issue was presented pursuant to W.R.C.P. 9(a), but no ruling was made by the trial court with the general grant of summary judgment on liability.

had originally bought the property at Boulder Lake from Mr. Nystrom. Mr. Allen was simply going to let Mr. Nystrom know that he was going to be spending the night at the Pickens cabin. Mr. Nystrom was not in his office at that time. * * * Mr. and Mrs. Allen did not stop anywhere else in Pinedale, since they wanted to get to the Pickens cabin before dark. * * *

* * * When Mr. Allen arrived at the Pickens cabin, there were no vehicles around, and there were no lights on in the Pickens cabin. Mr. Allen walked to the front door and knocked to see if anyone was there. When no one answered, Mr. Allen got back into his motorhome and drove down the road to the main lodge to see if he could get a key to the cabin. The people who ran the main lodge knew Mr. Allen, but the lodge was also closed down. * * *

* * * Mr. Allen then drove the motorhome back to the Pickens cabin and parked the vehicle in the driveway near the front of the structure. At the time he arrived back at the Pickens cabin, it was still light. According to Mr. Allen, Slim Pickens had told him that he had stashed a key to the cabin under the windowsill of one of the windows on the back of the cabin. * * *

* * * There was a deck across the back of the cabin, which could be accessed by one step up from the ground level to the deck, either coming in from the side of the house, or the back of the house. * * *

* * * When Mr. Allen arrived at the back of the Pickens cabin, he could see that tall grass had grown up in the cracks of the steps, and in front of the steps. Mr. Allen kicked the grass away to be sure that he was on the step, and then stepped up on to the back deck. The grass was a native grass. Although he could barely see the step, he knew it was there, and he was trying to be careful because of the grass. * * *

* * * Mr. Allen then walked over to the kitchen window, and ran his hand down under the sill, but found no key. He then did the same thing with the other window on the back of the house, and again found no key. He then decided that since there was nothing there, there was no sense in looking any further, and he started back to the motorhome. * * *

* * * Although Mr. Allen had entered onto the deck by using the one step at the side of the deck, he began to exit from the deck down the one step off the back of the deck. * * * It is Mr. Allen's belief that he put his left foot down onto the step, and slipped. * * *

* * * The step coming off the back of the deck looked the same as the step coming up the side of the deck, which was [sic] grass growing up in front of the step and between the boards on the step. Again, he knew there was a step there, and could in fact see the step. * * *

* * * Because of the grass on the step, Mr. Allen was trying to be more careful than normal, although probably not as careful as when he was coming up onto the deck, because he had successfully negotiated that step. * * * Mr. Allen believes that he slipped on the grass on the step, which caused him to fall. * * *

* * * As a result of slipping on the step, Mr. Allen hit either the side of his head or his eye, which caused the injury which is the subject matter of this litigation. * * *

In 1987, just before the tort statute of limitations expired, suit was instituted against the prior property owner, Slim Pickens Enterprises, and heirs of Pickens, primarily Margaret Elizabeth Lindley, the widow. She denied knowledge of the accident until three years after it had occurred. Following institution of suit, discovery was diligently pursued and, after completion, summary judgment was granted against Allen in trial court finding that "Rex [Allen] was a social guest of defendants and was thus a 'licensee.' The defendants breached no duty to the plaintiffs."

We agree.

The record establishes that Allen neither contacted Pickens nor the Pickens

family in 1983, nor did anyone arrange to have the facility habitable for that summer season. The natural condition of an unoccupied summer cabin does not establish a duty for which violation in these factual circumstances can be extrapolated, even though Allen bases an apparent claim for recovery in failure of Pickens to cut the grass and otherwise prepare for the 1983 summer occupancy just in case somebody might "stop by."

Another suggestion as a premise for fault is made of improper design which permitted the grass to grow up within the steps and walkways. The natural condition and its vacant status were unquestioned. We also fail to find persuasion of fault in this contention. Allen could see the vacant condition and the growing foliage which is indigenous to an unoccupied summer cabin. Nothing in these circumstances lead us to a viable contention of some kind of negligence. We are unpersuaded that with Pickens ill and unavailable, a duty existed from which negligence can be discerned to cut the grass at an unoccupied cabin for an unexpected visitor. In itself, naturally growing grass is not unnaturally dangerous if walkway usage is neither invited nor expected. *Radosevich v. Board of County Commissioners of Sweetwater County*, 776 P.2d 747 (Wyo.1989). *Cf. Reno Livestock Corp. v. Sun Oil Co. (Delaware)*, 638 P.2d 147 (Wyo.1981); *Timmons v. Reed*, 569 P.2d 112 (Wyo.1977); and *Knudson v. Hilzer*, 551 P.2d 680 (Wyo.1976). An owner of property has no duty to invitees to correct a known and obvious danger, if there was one here, created by naturally growing grass and cabin foliage. *Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo. 1986). There is no actionable negligence in the absence of a duty neglected or violated. *Jackson v. Land*, 391 P.2d 904 (Okl.1964). The key to the creation of a duty to the invitees on the premises is foreseeability. *Becker v. Diamond Parking, Inc.*, 768 S.W.2d 169 (Mo.App.1989).

The status of this visitor, except to discern that he was not a trespasser, is unimportant under these circumstances. Within the particularized facts of a general invitation in a prior year and present visit to the unoccupied summer cabin without advance notice, the designation of the relationship is unnecessary in assessment that no duty of care was violated. Whether to be differentiated to be a bare licensee in legal theory or a social guest, the visit of Allen was unexpected, unplanned and unprepared. We do not find either a genuine issue of material fact with conflicting evidence or interpretations from which reasonable minds might differ. *Radosevich*, 776 P.2d 747; *Baldwin v. Dube*, 751 P.2d 388, 390 (Wyo.1988).

Consequently, we affirm.